Argued and submitted July 15, 2004; resubmitted en banc February 9, reversed
and remanded for reconsideration May 18, 2005

In the Matter of the Compensation of
John P. Tye, Claimant.

John P. TYE,
*Petitioner,*

*v.*

Gary McFETRIDGE
and SAIF Corporation,
*Respondents.*

02-01738; A122013

112 P3d 435

R. Adian Martin argued the cause and filed the brief for petitioner.

David L. Runner argued the cause and filed the brief for respondents.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, and Ortega, Judges.

EDMONDS, J.

**EDMONDS, J.**

Claimant seeks review of a Workers' Compensation Board (board) order in which the board calculated his temporary disability compensation by including a 15-week seasonal layoff. We review for errors of law, ORS 656.298(7), and reverse.

The facts are not in dispute. For 20 years, claimant has been a logger and mill worker. He works seasonally in Wallowa County. The work season is determined by the ground conditions for logging and when the local mill will begin accepting logs. Typically, he is off for about five months when the forests are too wet for logging. He began working for McFetridge (employer), doing business as Haywire, on November 30, 1998, and that season continued through March 1, 1999. The next season ran from June 15, 1999 to February 22, 2000. Claimant began work again on June 1, 2000, and continued until January 26, 2001. He started the following season on July 1, 2001. On November 21, 2001, claimant sustained the injury that is the subject of this claim. At the time, the season was expected to continue for several months. During all of the described seasons, claimant worked for employer. After the last two seasons, claimant filed unemployment claims listing Haywire as his "most recent," "second most recent," and "third most recent" employer, mirroring the seasons indicated above. For each of those periods, he checked the box "Lack of Work" as reflecting the reason for the end of his employment. The claim information submitted by employer states that claimant worked eight-hour shifts Monday through Friday and that his wages were $22 per hour. Claimant testified that his work hours could vary between 35 and 42 hours per week. The administrative law judge (ALJ) found that "[c]laimant had been working at an hourly rate of $22.00 per hour over work weeks ranging from 35 to 40 to 42 hours since returning to work on or about July 1, 2001[,]" and there is substantial evidence in the record to support those findings.[1]

---

[1] The board adopted the ALJ's findings.

In January 2002, employer's insurer, SAIF, notified claimant that his time-loss compensation would be calculated using the average of wages that he earned from employer from November 21, 2000 through November 20, 2001. That notification led claimant to seek relief before the Hearings Division. Eventually, the board agreed with SAIF. The effect of that ruling is that claimant's time loss is based on an average weekly wage of $487.34 instead of $880.00; or, put another way, a $12.18 wage per hour instead of $22.00 per hour. The board held that claimant's 15-week seasonal layoff from January 26, 2000 to July 1, 2001, was not an "extended gap" within the meaning of OAR 436-060-0025(5) because it was "contemplated by both claimant and the employer when the employment relationship was formed * * *."

■■ Claimant assigns error to the board's order, arguing that his "temporary disability benefits should be calculated based upon his wage at injury for this employer, exclusive of his period of unemployment." Claimant reasons that his period of unemployment was an "extended gap" within the meaning of the rule. SAIF and employer respond that, because the 15-week gap was contemplated by the parties, it was *not* an "extended gap" within the meaning of the rule. We agree with claimant that his disability benefits must be calculated based on his wage at the time of his injury exclusive of the period of time that he was not employed with employer but for a different reason than he asserts. We conclude for the reasons that follow that the "extended gap" portion of the rule is inapplicable to claimant's circumstances.[2]

This case turns on the proper interpretation of an administrative rule. The statute governing the amount of temporary total disability payable to claimant, ORS 656.210(2)(b)(A), is unambiguous. It provides that "[t]he benefits of a worker who incurs an injury shall be based on the wage of the worker at the time of the injury." ORS 656.210(2)(e) provides that workers not regularly employed

---

[2] We have an independent obligation under the law to discern the correct interpretation of an administrative rule, regardless of the arguments of the parties. *Cf. Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (holding that, in construing a statute, a court's task is to identify the correct interpretation, whether or not asserted by the parties).

or whose remuneration is not based solely upon daily or weekly wages, the Department of Consumer and Business Services may promulgate rules to establish the worker's average weekly wage. OAR 436-060-0025(5)(a)(A) (Nov 27, 1996), sets forth the method for calculating the average weekly wage of a worker who, like claimant, works seasonally or is paid hourly. We turn then to the provisions of OAR 436-060-0025 (Nov 27, 1996), the applicable rule in this case. It provides, in relevant part:

"(1)  The rate of compensation shall be based on the wage of the worker at the time of injury * * *.

"* * * * *

"(3)  The rate of compensation for regularly employed workers shall be computed as outlined in ORS 656.210 and this rule. As used in this rule, 'regularly employed' means actual employment or availability for such employment.

"* * * * *

"(5)  The rate of compensation for workers regularly employed, but paid on other than a daily or weekly basis, or employed with unscheduled, irregular or no earnings shall be computed on the wages determined by this rule. The insurer shall resolve disputes regarding wage calculations by contacting the employer and worker to determine a reasonable wage. If an agreement cannot be reached, the dispute may be referred to the Division for resolution.

"(a)  For workers employed seasonally, on call, paid hourly, paid by piece work or with varying hours, shifts or wages:

"(A)  Insurers shall use the worker's average weekly earnings with the employer at injury for the 52 weeks prior to the date of injury. *For workers employed less than 52 weeks or where extended gaps exist, insurers shall use the actual weeks of employment (excluding any extended gaps) with the employer at injury up to the previous 52 weeks.* For workers employed less than four weeks, insurers shall use the intent of the wage earning agreement as confirmed by the employer and the worker. * * *"[3]

---

[3] We apply the version of the rule in effect when claimant was injured. Similarly, we apply the 1999 version of the statute because the amendments made to the statute by the 2001 legislature applied to "all claims with a date of injury on or

(Emphasis added.)

■■ The analytical framework applicable to the interpretation of a statute is also applicable to the interpretation of administrative rules. *Thomas Creek Lumber v. Board of Forestry*, 188 Or App 10, 22, 69 P3d 1238 (2003). We begin by examining the text of the rule within its context. Unless defined otherwise in the rule, we give the words of the rule their ordinary meanings. Subsection (1) of the rule echoes the mandate of ORS 656.210(2)(b)(A) that the rate of compensation be based on the wage of the worker at the time of the injury. Subsection (3) does two things: first, it provides that the rate of compensation for "regularly employed" workers shall be computed on the wages determined by the rule. Second, and important to our analysis in this case, subsection (3) defines the term "regularly employed" as "actual employment or availability for such employment."

We turn next to subsection (5) of the rule. The first paragraph of subsection (5) is inapplicable to claimant because the parties do not dispute that his compensation should be based on his average weekly wage. It follows that paragraph (5)(a) and subparagraph (5)(a)(A) are the controlling portions of the rule in light of the seasonal nature of claimant's employment and his varying hours and earnings. Subparagraph (5)(a)(A) divides the employment circumstances of such workers into four categories.[4] The first sentence of the paragraph designates a category of workers who have average weekly earnings with the subject employer for "the 52 weeks prior to the date of injury." Claimant is not a worker who fits into the first classification; he did not work for employer during February through June of 2001. Thus, our analysis proceeds to the second sentence or classification of workers in subparagraph (5)(a)(A).

The second sentence in subparagraph (5)(a)(A) defines two categories of employment circumstances, the first of which is embodied in the first prefatory phrase of the sentence, "[f]or workers employed less than 52 weeks[.]" That

---

after January 1, 2002." Or Laws 2001, ch 865, § 22(1), *compiled as a note after* ORS 656.202 (2001). The 2003 legislative amendments did not make changes to the relevant subsections. Or Laws 2003, ch 760, § 1.

[4] The fourth category, workers employed fewer than four weeks, does not apply to claimant, who was employed for more than that period of time.

phrase is separated from the prefatory phrase that follows ("where extended gaps exist") by the disjunctive word "or." The latter phrase defines the second set of employment circumstances to which the sentence applies. For purposes of clarity, this opinion will subsequently refer to the category of employment circumstances defined in the first prefatory phrase as the "second" category of workers and the category of employment circumstances referred to in the second prefatory phrase in the sentence as the "third" category of employment circumstances. Regarding both the second and third category, "insurers shall use the actual weeks of employment (excluding any extended gaps) with the employer at injury up to the previous 52 weeks[.]"

■        The second and third categories are mutually exclusive. Otherwise, there would be no need for the rule to define two discrete categories of employment circumstances. *Cf.* ORS 174.010 ("where there are several provisions or particulars" contained within a statute, a construction is, "if possible, to be adopted as will give effect to all"). The question becomes into which category claimant's employment circumstances fit: the second category governing workers who are employed for less than 52 weeks or the third category governing employment circumstances where gaps in employment exist. The answer turns on when claimant is deemed to have commenced his employment with employer. Claimant had no gaps, extended or otherwise, in his employment after July 1, 2001. If his employment began on that date, the third category or the "extended gap" category is irrelevant. It would follow from that premise that claimant's average weekly wage would be calculated based on his actual weeks of employment between July 1, 2001 and November 21, 2001.

The issue therefore becomes how the rule determines whether claimant's employment began on July 1, 2001, or on an earlier date, as the board held when it determined that claimant's average weekly wage should be calculated on a 52-week basis. The answer to that query is found in subsection (3) of the rule that defines what it means to be "regularly employed." Under the rule's definition of "regularly employed," a worker's employment commences for purposes of the rule when the worker is actually employed by the

subject employer or is available for work with the subject employer that the employer has available to offer. OAR 436-060-0025(3) (Nov 27, 1996).

In this case, claimant was not actually employed by employer between January 26, 2001 and July 1, 2001. Also, there is no evidence on the record before us that claimant was "available" for work with employer during that time period as contemplated by the rule. As used in the rule to calculate the worker's wage at the time of injury, the word "available" means "accessible or may be obtained: personally obtainable (as for employment)[.]" *Webster's Third New Int'l Dictionary* 150 (unabridged ed 2002). There is no evidence in this record that employer had work that claimant could have personally obtained between January 26 and July 1, 2001. In fact, apparently, he was receiving unemployment compensation during that time period. The fact that claimant was receiving unemployment benefits implies additionally that employer had no work available for him during that time. Thus, claimant was not regularly employed with employer after January 26, 2001 until July 1, 2001 within the meaning of the rule. It follows that he is subject to a computation of his base wage under the second category defined by the rule as a worker who was regularly employed less than 52 weeks at the time he was injured in November 2001.

The parties' and the board's confusion about when to apply the third category formulation is understandable because of the inartful way in which the third category regarding gaps in employment is defined. The rule provides that, "where extended gaps exist, insurers shall use the actual weeks of employment (excluding any extended gaps) with the employer" to compute a base wage. However, considered in context with the rest of the rule, the third category could apply only to a period of employment that occurred after the point when the claimant became regularly employed by the subject employer and in which gaps in that period of employment occurred thereafter. If the circumstances of the employment with the subject employer fall within the third category, then the rule requires that the board determine whether the gaps are "extended" in nature,

and if it finds that the gaps are extended, then it is required to exclude those time periods from the period of employment to determine the worker's base wage. Here, the board was not required to undertake that exercise because there were no extended gaps in claimant's employment that began on July 1, 2001.

In its opinion in this case, the board undertook to follow our decisions in *SAIF v. Frias*, 169 Or App 345, 8 P3d 1005 (2000) and *Garcia v. SAIF*, 194 Or App 504, 95 P3d 1166 (2004). However, when those decisions are correctly understood, they are consistent with the above interpretation of the rule. In *Frias*, the claimant worked irregular hours as a construction worker at the rate of $12 per hour. 169 Or App at 347. His injury occurred within a seven-month period of employment during which he took a vacation and experienced two periods of time off when the employer had no work available for him. *Id.* at 348.[5] After the employer stipulated that the claimant's three-week vacation was an "extended gap," the only issue before us was whether the remaining gaps in the claimant's employment were "extended." *Id.* at 348, 353. The board "add[ed] up all the gaps during the preceding year (or during a worker's employment if less than a year) and then compar[ed] the sum to the span of the preceding year (or to the period of employment)" to see if the "sum of the gaps comprise[d] a sufficiently high percentage of the whole." *Id.* at 348-49. After considering the text and context of the rule, we rejected the board's method of evaluating the gaps cumulatively. *Id.* at 353. Rather, we concluded, "[t]he determination of whether a gap is extended must be made in light of its length and of the circumstances of the individual employment relationship itself, including whether the parties contemplated that such gaps would occur when they formed the relationship." *Id.*[6] The crucial distinction between this case and *Frias* is that *Frias* involved circumstances where the gaps in employment occurred after the claimant commenced regular employment with the subject employer.

---

[5] The claimant's employment relationship in *Frias* began in May and continued through December when he was injured.

[6] On remand, the board explained; "The first gap was slightly more than two weeks. The second was a little over two and a half weeks." *Pedro Frias*, 52 Van Natta 2246, 2247 (2000).

A similar situation existed in *Garcia*. In *Garcia*, the

"[c]laimant started working as a tree planter for employer, a reforestation and fire cleanup company, in approximately 1999. He worked for employer seasonally, with each season's employment dependent on whether employer obtained a contract from the federal government. In addition, whether employer had work for claimant depended on the weather; during the winter when there was snow in the mountains, no work was available, and, during the summer, fire danger either prevented work or reduced work hours. When each job assignment concluded, claimant contacted employer to learn when he would next be needed.

"For each job assignment, employer required claimant to sign an employment agreement that set forth the expected period of work under a particular federal contract, the location of the work site, and the pay. In 2001, claimant signed employment agreements with employer for the periods from February 26 through March 9, 2001, and from April 16, 2001 through May 24, 2001. During the period covered by those agreements, there were two stretches when work was unavailable—one for 6 days, the other for 17 days."

194 Or App at 506.

Before the board, the claimant in *Garcia* made two arguments. First, he argued that the gaps in his employment were "extended" so that they should be excluded from the number of weeks worked in the computation of the average weekly wage. *Id.* Second, he argued that, regardless of whether the gaps were extended, he was "actually employed" only when the various employment contracts were in effect during the pertinent 52-week period. *Id.* The board rejected both arguments, reasoning as to the latter that the claimant's job with the employer was continuing and ongoing over a 52-week period. *Id.* It therefore ordered the calculation of temporary total disability as if the claimant had worked the 52 weeks preceding the injury. *Id.*

On review, the claimant challenged the board's reasoning. *Id.* at 508. In rejecting the claimant's argument that he was working only when the various employment contracts were in effect, we held that, "[i]n this context, to treat the

agreements as somehow distinguishing claimant's employment status from that of any other seasonal worker would elevate form over substance." *Id.* at 509. We noted that the testimony at the hearing was that "the agreements served to clarify the expectations and details of work to be performed under a particular federal contract rather than to establish anew the employer/employee relationship." *Id.* Further, "the parties assumed that claimant would continue working for employer" because, "after each job concluded, claimant would contact employer to learn when he would next be needed for work." *Id.* We also agreed with the board that "the two gaps that occurred during employment agreements * * * were insufficiently lengthy to be considered 'extended.' " *Id.*

To the extent that *Garcia* could be understood to stand for the categorical proposition that, whenever there is a seasonal layoff in employment contemplated by an employer and a worker, the interruption in employment is to be included in computing the weekly average wage, we disavow that understanding. At the core of our decision in *Garcia* is the determination that the claimant's employment arrangement was akin to continuing employment for an entire 52-week period with the same employer because the claimant was available for work with the employer and would work during the entire 52-week period before his injury whenever the employer had work for him to do. *Id.* at 509. The fact that the claimant in *Garcia* was regularly employed for a 52-week period with gaps of employment within that period of time makes it distinguishable from this case, where claimant's employment with employer ended on January 26, 2001, and began anew on July 1, 2001.

Because claimant worked fewer than 52 weeks per year without extended gaps in the period of regular employment that began on July 1, 2001, the first phrase of the second sentence in OAR 436-060-0025(5)(a)(A) (Nov 27, 1996) is the governing rule. On remand, the board must apply that provision of the rule in making the determination of claimant's average wage at the time of injury that the statute and the rule require.

Reversed and remanded for reconsideration.